STATE OF LOUISIANA

VERSUS

LAMONTE LOGGINS

NO. 23-KA-519

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 21-2748, DIVISION "K"
HONORABLE ELLEN SHIRER KOVACH, JUDGE PRESIDING

October 30, 2024

**MARC E. JOHNSON**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Marc E. Johnson, and Stephen J. Windhorst

**CONVICTIONS AFFIRMED;**
**COUNT ONE SENTENCE AFFIRMED;**
**COUNT TWO SENTENCE VACATED;**
**REMANDED FOR RESENTENCING;**
**REMANDED FOR CORRECTION OF**
**THE UNIFORM COMMITMENT ORDER**
   **MEJ**
   **SMC**
   **SJW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Paul D. Connick, Jr.
    Thomas J. Butler
    Andrea F. Long
    Brittany Beckner
    Carolyn Chkautovich

COUNSEL FOR DEFENDANT/APPELLANT,
LAMONTE E. LOGGINS
    Jane C. Hogan

**JOHNSON, J.**

Defendant, Lamonte Loggins, appeals his convictions and sentences for first degree murder and obstruction of justice in the 24th Judicial District Court, Division "K". For the following reasons, we affirm Defendant's convictions, affirm Defendant's life sentence for first degree murder, vacate Defendant's sentence for obstruction of justice, and remand the matter with instructions.

## FACTS AND PROCEDURAL HISTORY

On August 12, 2021, a Jefferson Parish Grand Jury returned a bill of indictment charging Defendant with the first degree murder of Abdel Sylla, in violation of La. R.S. 14:30 (count one), and obstruction of justice by removing the murder weapon from the scene and disposing of it, in violation of La. R.S. 14:130.1 (count two). Defendant was arraigned on August 18, 2021, and pleaded not guilty.

On June 29, 2023, the State filed a motion for discovery, demand for notice of alibi and/or mental condition defenses and a notice of intent to introduce evidence of other offenses. On July 19, 2023, the State's notice of intent to introduce evidence as *res gestae* or in the alternative under La. C.E. Article 404(B) was filed. On July 23, 2023, Defendant filed an opposition to the State's intent to introduce evidence as *res gestae* or in the alternative under La. C.E. Article 404(B). On July 24, 2023, the judge granted the State's notice of intent to introduce evidence as *res gestae* or in the alternative under La. C.E. Article 404(B). On the same date, a 12-person jury was selected.

At trial, Erica Winford testified that she lived with her boyfriend, Eric Rodgers, at 4337 Loire Drive, Apartment D, in Kenner in November 2020. At the time, she owned a Hyundai Sonata that she shared with Rodgers. She spent Thanksgiving of 2020 with Rodgers in New Orleans. She recalled that Rodgers' brother, Lamonte Loggins, arrived in New Orleans the Saturday after

Thanksgiving.  On the evening of November 30, 2020, Rodgers and Defendant were home with Ms. Winford, and the brothers left sometime after 9:00 p.m. in Ms. Winford's Hyundai.[1]

Rodgers[2] testified that he and his brother, Defendant, robbed a Shell gas station on West Esplanade and Williams Boulevard in Kenner on November 30, 2020.  He stated their plan was to get money from the cash register because of the pandemic.[3]  He recalled that in preparation for the robbery, they went to the gas station earlier in the day to determine who worked there and how many people would be there.  Rodgers testified that during the first visit, he purchased cigars, and he and Defendant went back to his house at 4337 Loire Drive, where he lived with Ms. Winford.  Later that evening, Defendant and Rodgers drove near the gas station and parked on a back street.  Rodgers and Defendant walked to the gas station.

Rodgers stated that he viewed surveillance video from the store and identified himself in the video.  A compiled and condensed version of the surveillance video was played for the jury.  In that video, a man in dark clothes entered the store.  He walked to a drink cooler and appeared to be on the phone.  Rodgers testified that when he entered the store, he was on the phone, and he walked to the back of the store.  He identified himself in the surveillance footage as he walked through the door.  Rodgers stated he was supposed to act as the

---

[1] Ms. Winford acknowledged that November 2020 was during the height of COVID, and she kept latex gloves, masks, and sanitizer in her car.

[2] He acknowledged that he was previously convicted of "criminal attempt, aggravated burglary," aggravated robbery, having contraband in jail, manslaughter, armed robbery, and obstruction of justice. He acknowledged that he signed a plea agreement related to this incident.

[3] Rodgers recalled that due to the pandemic, he and Ms. Winford had financial problems.  He agreed that he was receiving notices from creditors.

Ms. Winford denied that she and Rodgers were behind on their bills in late November 2020. When presented with a delinquency notice addressed to Rodgers, she indicated that she was unaware of it or their financial situation.  She recalled that neither she nor Rodgers were working at the time and that they had three children.

lookout during the robbery. The video then showed a man in a white hat enter the store. While viewing the surveillance footage, Rodgers identified Defendant as the man entering the store wearing a white hat.

In the video, Defendant (the man in the white hat) looked around, appeared to acknowledge the clerk, and proceeded to get a cup of coffee. The clerk stepped from behind the counter to help with the coffee and then returned behind the counter. Rodgers (the person in dark clothes) left the store, and Defendant walked to the counter. He interacted with the clerk and pointed to an item behind the clerk. The clerk retrieved the item. After the clerk returned to the counter, Defendant pulled a gun from the pocket of his jacket and pointed it at the clerk. He fired a shot near the clerk as the clerk fell on the ground. Rodgers re-entered the store while still on the phone. He walked behind the counter and took two packs of Newport cigarettes as the clerk appeared to try to get the cash register to open. While viewing the video, Rodgers identified himself walking behind the counter and taking two packs of Newport cigarettes.

The video showed Rodgers exit from behind the counter as the register opened. The clerk put the cash drawer on the counter, and Defendant removed all of the bills. The clerk knelt on the ground with his hands in the air. Rodgers opened the store door and stood there. Defendant walked behind the counter and appeared to hit the clerk with the gun. He then shot the clerk.[4] Defendant and Rodgers left the store as the clerk laid on the ground behind the counter. The clerk managed to reach his cell phone and make a call.[5] The video showed the police arrive and enter the store with their weapons drawn. The officers located the clerk,

_____

[4] Rodgers stated that he believed Defendant only fired the gun once.

[5] Rodgers explained that the store clerk never said he was going to call the police. Rodgers acknowledged that the store clerk knew him and could identify him by his face tattoos. He denied telling Defendant to kill the clerk because he could identify him.

It appeared the clerk called 9-1-1. In a 9-1-1 call played for the jury, the caller stated that he was robbed and shot.

and an officer attempted to render aid. EMS ultimately entered the store. EMS assessed the clerk, who was still alive at that time, and took him away.

Rodgers stated he did not have a gun with him at the gas station, and he did not know anyone would get hurt during the robbery. Rodgers testified that Defendant told him that he got the gun from their sister, April Rodgers, around Thanksgiving. Defendant showed him the gun when he returned to New Orleans from Memphis. The parties entered a stipulation that, if called to testify, Memphis Police Officer Dustin Maglisco would testify that he met with April relative to a firearm that was reported stolen on November 27, 2020 as part of his investigation. The stipulation reflected that Officer Maglisco met with April, and she provided him with the box belonging to her stolen firearm, which was a Taurus 9 mm gun.

Rodgers testified that, after leaving the gas station, he and Defendant went through the parking lot of the bank behind the gas station to get to their car. During that time, Rodgers asked Defendant why he shot the man, but Defendant did not answer him. They drove back to the house on Loire Drive. Ms. Winford recalled that Rodgers and Defendant returned home after 2:00 a.m., and she was in bed. Rodgers explained that Defendant told him to give him his clothes, which Defendant then put in a trash bag into which he poured bleach. Rodgers recalled that Defendant threw the bullets in the creek behind the house on Loire Drive. Rodgers explained that they put the money on the table,[6] and he laid down with Ms. Winford. He recalled that she asked him what was wrong. He told her that he thought he messed up, and that she would find out what he meant. Ms. Winford stated that Rodgers looked nervous and took a shower. Ms. Winford testified that he was acting different and was upset. He did not say anything about where he had been. Rodgers eventually went to sleep.

---

[6] Rodgers testified that he did not know how much money they took from the gas station. He recalled that Defendant later gave him half of the money.

Ms. Winford woke up early the next morning and saw a news alerts about a robbery at a Kenner gas station on her phone. She mentioned the news to Rodgers, who then told her that he thought Defendant shot a man when they were at the gas station. She recalled that Rodgers told her that he was there and he ran. She described Rodgers as acting nervous and smoking heavily that day.

Officer Billy Hingle with the Kenner Police Department responded to a call for service regarding an armed robbery on November 30, 2020, at a Shell gas station at West Esplanade and Williams. He recalled that he was informed that the armed suspect may have still been present, and he waited for backup to arrive. Once Officer Eric Hill and other officers arrived, they approached the gas station and saw someone behind the counter. Upon entering, the officers looked for suspects inside and cleared the building. Officer Hingle saw the victim, but it was not immediately apparent that he was shot because there was no blood on the ground. He observed signs of blunt force trauma to the victim's head. Officer Hingle testified that the victim said he could not breathe, and he thought the victim was confused. Officer Hingle stated that Officer Hill rendered aid and located a gunshot wound to the victim's chest. EMS then entered the building, rendered aid, and ultimately transported the victim to the hospital, where he later died.

Officer Hingle reviewed and described several photographs of the scene. The gas station had damage to a floor tile, and a possible bullet hole was observed on a box on the ground behind the counter. Two projectiles—one found on the floor on the customer side of the counter and another one inside a box—were

recovered. Three fired 9 mm casings and four fragments were found.[7]  A coffee cup from the counter was seized.[8]

Satishkumar Patel, the owner of the gas station, was contacted by the police and went to the scene.  He provided the police with surveillance footage.  After watching surveillance video, latex gloves on the counter were identified as having fallen out of Defendant's pocket as he brandished a firearm.

Detective Aaron Savoie with the Kenner Police Department served as the lead investigator of the robbery-homicide at the Shell gas station on November 30, 2020.  When Detective Savoie arrived at the scene, he spoke to the responding officer and then went in the store.  Detective Savoie explained that items were seized and sent to the crime lab.  Dr. Marcella Zozaya, a forensic DNA analyst with the Jefferson Parish Sheriff's Office ("JPSO"), analyzed swabs from several items in this case.[9]  A Combined DNA Index System ("CODIS") search matched Defendant's DNA to the DNA on the latex gloves, and Dr. Zozaya testified there was support that Defendant was a contributor to the DNA on the gloves.[10]

Detective Savoie directed responding officers to canvas the area for additional surveillance video and to conduct an automated license plate recognition ("ALPR") system query to determine vehicles in the immediate area of the scene.[11]

---

[7] Alexis Riviera, previously a JPSO firearm and tool mark analyst, assisted in this investigation and authored a report.  She examined three 9 mm cartridge casings recovered from the scene and determined that they were fired from the same 9 mm pistol.  She agreed that a Taurus pistol could have fired the ammunition collected from the scene but that without the weapon, she could not say so definitively.  Ms. Riviera also examined a copper jacketed projectile and a jacket fragment which were fired from the same weapon.  Additionally, she examined a lead-like projectile and three fragments, but she was unable to obtain information from them.

[8] The cup, casings, and bullet strikes on the floor had already been identified by the time Detective Aaron Savoie arrived at the scene.

[9] As to the coffee cup swabs, Ms. Winford was a contributor to the DNA on the cup, and Rodgers and Defendant were excluded as contributors to the DNA mixture.

[10] Detective Savoie similarly testified that there was a DNA match to Defendant on the latex gloves.

[11] Sergeant Bryan Weiter with the Kenner Police Department assisted in investigating a potential lead into Malik Chester.  He explained that license plate cameras and surveillance cameras near the Shell gas station captured a white Honda connected to Mr. Chester near the gas station around the time of the incident.  Mr. Chester was arrested by another jurisdiction several hours after the incident.  Sergeant

---

A large amount of surveillance footage was collected from residences and businesses. Based on the surveillance footage, the police created a map of the suspects' route. The footage was played for the jury as Detective Savoie narrated. He explained that the two suspects parked and walked together until they split up. The detective stated one suspect wearing a white beanie jumped a fence to get to the gas station.

Detective Savoie created a similar map of the suspects' route leaving the scene after the crime. That map was described by the detective as it was published to the jury. Detective Savoie explained that two suspects are seen running and that the second one is wearing a white beanie. The suspects returned to their vehicle and drove to 4337 Loire Drive. Detective Savoie testified that initially the license plate of the suspects' vehicle could not be seen, and it was unclear if there even was a license plate.

On December 1, 2020, Rodgers asked Ms. Winford to drive him and Defendant to Biloxi, Mississippi. Ms. Winford recalled that she agreed because she was scared and wanted them out of the house. Rodgers, Defendant, and Ms. Winford drove the Hyundai Sonata to Biloxi, Mississippi, where Rodgers and Defendant would take a bus to Memphis to work for their uncle. Rodgers explained that they did not take a bus from New Orleans because he assumed the police would look for them there. On the way, they stopped to drop off Ms. Winford's children at Rodgers' parents' home in Hollygrove. When Rodgers came out of the house, Defendant said he put the clothes from the bag containing bleach in the neighbor's trash can.

Once in Biloxi, they went to a Shell gas station. Rodgers and Ms. Winford went in the store while Defendant stayed in the car. Rodgers testified that

---

Weiter interviewed him and determined that he was not connected to the incident. He stated that other leads were also explored but were not successful.

Defendant later told him that he threw his gun in a trash can at the Shell gas station in Biloxi. There were no buses to Memphis that day, so Ms. Winford obtained a hotel room. She walked with Defendant and Rodgers to the room. She spoke to Rodgers, who was crying, and then she drove home. The next morning, Rodgers and Defendant took a bus to Memphis.

Sergeant Weiter testified that he was sent to a hotel, a gas station, and a bus station in Biloxi. He identified surveillance footage from those locations, which was played for the jury. Sergeant Weiter testified that the gas station footage showed Rodgers and Ms. Winford walk into the store as Defendant walked to the dumpster area before going in the store.[12] Surveillance video from the hotel showed Ms. Winford obtain a hotel room.[13] Sergeant Weiter stated that Ms. Winford did not stay the night at the hotel. Footage from the bus terminal was played for the jury. Sergeant Weiter testified that the video showed that Defendant was wearing black rubberized shoes. Defendant and Rodgers bought bus tickets for December 2, 2020 from Biloxi to Memphis.[14]

A Hyundai Sonata belonging to Ms. Winford was identified as a lead in the investigation. On December 2, 2020, Detective Kevin Treigle with the Kenner

---

[12] The footage shows a gray vehicle stop at a gas pump. Two people, identified by Detective Weiter as Rodgers and Ms. Winford, get out of the car first and walk away. The video showed Defendant exit the driver's seat of the car and retrieve something from the trunk. Footage from a different camera showed a man and woman, whom Detective Weiter identified as Rodgers and Ms. Winford, enter the gas station at approximately 19:47, according to the video timestamp. Defendant entered the store approximately two minutes later. A different camera angle showed a parking area with a dumpster. Detective Weiter identified Defendant in the video as the person approaching the dumpster.

[13] The surveillance footage from the hotel showed a gray vehicle, which was the same grey Hyundai Sonata Detective Weiter described in his testimony. Defendant exited the driver's seat, and Rodgers exited the back passenger seat. They appeared to look at the back of the vehicle before Defendant walked out of view of that camera. Defendant returned to the vehicle. Rodgers and Ms. Winford then exited the vehicle and walked out of view. Footage from inside the hotel lobby showed Defendant enter, speak with the front desk clerk, and exit. Later, Ms. Winford and Rodgers entered the hotel and spoke to the clerk.

[14] Video from the bus station terminal showed Defendant pay cash for bus tickets, while Rodgers stood nearby talking on the phone.

Sergeant Weiter explained that on the tickets, Defendant's last name was spelled with a "G" at the end, and Rodger's first name was misspelled with an additional "K." He acknowledged that these may have been intentionally misspelled to disguise the names or had been an entry error.

---

Police Department assisted in tracking and locating a grey 2012 Hyundai Sonata. The vehicle was parked at 4337 Loire Drive in the driveway behind a Lincoln Town Car associated with Rodgers and Defendant.[15] Detective Treigle requested assistance surveilling the Hyundai. When the Hyundai left the residence, Detective Treigle maintained surveillance of the residence, while other officers followed the vehicle and conducted a traffic stop. A tracker was placed on the Hyundai, which belonged to Ms. Winford, at some point after it returned from Biloxi. The tracker revealed that the vehicle traveled from 4337 Loire Drive to an address in New Orleans.

Ms. Winford's vehicle was seized. Sergeant Vincent Moranti with the Kenner Police Department assisted in searching the Hyundai. Paperwork with Rodgers' name and paperwork addressed to Ms. Winford were found in the vehicle. An Apple cell phone and a black rubber slip-on shoe were also found in the vehicle.

Detective Savoie testified that 4337 Loire Drive, Apartment D, was searched. Two boxes of Newport cigarettes were found—one on the sidewalk leading to the apartment and another in a trash can inside the apartment.[16] Household cleaners containing bleach were found in the apartment. Detective Savoie explained that the cleaners were significant because, when he and another detective entered the apartment, they noticed a strong odor of bleach. He stated that he later learned from Rodgers that bleach was used on the clothing worn during the incident prior to the clothes being discarded. An iPhone box and

---

[15] Detective Treigle ran the license plate of the Lincoln and learned that it was registered to Courtney Loggins. He found three queries involving that vehicle and two individuals.

[16] Dr. Zozaya could not obtain sufficient DNA from one of the cigarette boxes. There was very strong support that Rodgers and Ms. Winford were contributors to the DNA on the other cigarette box, and Defendant was excluded as a contributor.

various paperwork addressed to Rodgers and Ms. Winford were found in the apartment.

Detective Savoie explained that, by the time the car was located and connected to Rodgers and Defendant, he had already spoken to the gas station owner, who recognized one of the suspects as a customer who bought Newport cigarettes. The owner described the suspect as "covered in tattoos," and the suspect had a tattoo between his eyes.[17] The driver's license for Rodgers showed the tattoo. The detective also connected Rodgers to the apartment on Loire Drive. Based on the suspects association with the Lincoln Town Car, the information from Mr. Patel, and the DNA match on the latex glove, Rodgers and Defendant were identified as suspects by the police, and an arrest warrant for Defendant was obtained.

On December 8, 2020, after having already spoken to Ms. Winford,[18] Detective Savoie received an anonymous call. The caller provided information about the incident that was not released to the media. The caller, later determined to be Rodgers, stated that his brother shot the man, the gun was in a dumpster at a Shell gas station in Biloxi, and the gun would not be found because it was in a landfill.[19] Detective Savoie said Rodgers showed no remorse and provided an

---

[17] Mr. Patel, the gas station owner, testified that when he watched the surveillance footage, he recognized one of the suspects by a tattoo of numbers on his forehead. He recalled that the person had frequently bought Newport cigarettes from his store. The police showed him photographs, and he recognized the tattooed customer.

[18] Detective Savoie spoke to Ms. Winford sometime after he obtained the arrest warrant for Defendant. She informed him that on November 30, 2020, Rodgers and Defendant went to the store, and Rodgers appeared to be frazzled when they returned. Ms. Winford told the detective that Defendant and Rodgers took her Hyundai Sonata to the store. Detective Savoie testified that she told him that the next morning, she saw reports of the homicide and photographs of the two suspects. She recognized the suspects as Defendant and Rodgers. Upon speaking to Rodgers about it, he confessed to her that it was him and that Defendant shot the man. Ms. Winford also told the detective that she wanted Defendant and Rodgers out of the house and that Rodgers initially wanted to go to Memphis without Defendant. The detective corroborated Ms. Winford's statements about bringing Defendant and Rodgers to Biloxi, where they took a bus to Memphis.

[19] Rodgers testified that at some point while he was in Memphis, he called the police in Kenner. He indicated that he called twice and that he spoke to a detective the second time. Rodgers recalled that he told the detective what happened, Defendant was the shooter, and where Defendant was located.

address to Defendant's location. Detective Savoie corroborated everything said on the call, and Rodgers was arrested the next day in Memphis.

Defendant was arrested in Memphis at the location Rodgers provided. While in the Memphis jail, Defendant made a recorded phone call on December 22, 2020. That call was played for the jury. In the call, Defendant stated that he will either get "life or death," he does not expect leniency, and he deserves what he gets. He said, "I did what I did. Nobody forced me to do it. I did that. Nobody put a gun in my hand." Defendant continued, "I wasn't high. I wasn't drunk. I was sober-minded. I did what I did. I got to live with that. It just sucks that I got my brother involved in it." Defendant voiced that he was considering pleading guilty.

A phone was seized from Defendant when he was arrested.[20] Search warrants were obtained for cell phone records. Detective Savoie obtained call records associated with Defendant's phone number, which were GPS plotted by the state police. The detective said that the coordinates in the call records corroborated Rodgers' statement that he and Defendant committed the armed robbery and murder of Mr. Sylla in Kenner, traveled to the Biloxi area, and then traveled to Memphis, Tennessee. The phone had connected to the Greyhound bus wi-fi and to the hotel wi-fi.

Rodgers was extradited to Kenner and provided a statement.[21] Detective Savoie testified that in the statement, Rodgers said Defendant threw the rounds

---

[20] Lieutenant Ed Rhode, then with the digital forensic unit of the Kenner Police Department, conducted a phone extraction on an LG cell phone related to this case. The parties stipulated that when Defendant was arrested on December 8, 2020, in Memphis, he was in possession of an LG phone that was later transferred to the custody of the Kenner Police Department.

[21] Rodgers acknowledged that he told the police then that he did not know why Defendant parked where he did that night, he did not see a gun on Defendant, and he did not know there was going to be a robbery. Rodgers stated he lied at the time to try to save himself and Defendant. A detective agreed that in Rodgers' plea agreement, he indicated that he served as a lookout during this incident, that he did not know there would be a robbery and that he did not see a gun on Defendant.

from the firearm behind a creek behind the apartment complex before they left.[22]

Rodgers also told him that Defendant had asked him for his clothing from the incident, which Defendant put in a bag and poured bleach on before discarding the bag in a garbage can on Loire Drive. The detective stated that Rodgers said he and Defendant went to the Shell gas station before the incident and that at that time, he bought cigars, and Defendant bought a drink.[23] Based on information provided by Rodgers, on December 16, 2020, Detective Savoie contacted senior district management for Waste Management in Biloxi and was told that it was highly unlikely that the discarded firearm could be located.

Erica Loggins Tullison, the mother of Rodgers and Defendant, recalled that in November or December of 2020, a co-worker mentioned the robbery-homicide at the Shell gas station. She then looked at an article and said a photo in the article looked familiar. At some point, the Kenner Police went to her house. She identified Rodgers and Defendant in still photographs of surveillance footage. Ms. Tullison called "Crime Stoppers" at some point because she was concerned that Rodgers and Defendant were involved.

Forensic pathologist Dr. Dana Troxclair conducted an autopsy on Mr. Sylla. He sustained a gunshot wound that entered his left upper chest and exited his right mid-back area. She explained that lifesaving measures were performed while Mr. Sylla was at the hospital, and he died there. Dr. Troxclair stated his cause of death was a gunshot wound to the chest and his death was classified as a homicide.[24]

---

[22] Detective Savoie explained that he contacted Captain Todd Vignes with the JPSO about the ammunition but was told that based off of the information provided, there was no way to retrieve the discarded rounds.

[23] This was corroborated by surveillance video, which was played for the jury. Further, Defendant's phone records showed a transaction on November 30, 2020, at the Shell gas station.

[24] Dr. Troxclair stated Mr. Sylla had a pattern abrasion with a laceration on his forehead and a few pattern abrasions on his back. She explained that the exit wound was a shored exit, meaning when the bullet exited the body, the skin was against a surface such as the floor. She testified that there was not a lot of blood at the scene because it was building up in Mr. Sylla's body.

At the conclusion of trial, on July 26, 2023, the jury found Defendant guilty as charged on both counts of first degree murder and obstruction of justice by removing the murder weapon from the scene and disposing of it. On August 9, 2023, Defendant filed a motion for post verdict judgment of acquittal and for new trial. The judge denied the motion on August 10, 2023, and the State presented a victim impact statement. The judge then sentenced Defendant to life in prison without the benefit of parole, probation, or suspension of sentence as to count one and to 40 years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence as to count two. The judge ordered the sentences to run consecutively. During the sentencing hearing, Defendant objected to the sentence for obstruction of justice and the consecutive nature of the sentences and filed a Motion for Reconsideration of Sentence. The judge denied the motion to reconsider. A motion for appeal was also filed and granted on August 10, 2023. The instant appeal followed.

**ASSIGNMENTS OF ERROR**

On appeal, Defendant alleges: 1) there was insufficient evidence to sustain a conviction for obstruction of justice; 2) the trial court erred when it allowed the State to introduce evidence that he had allegedly stolen a firearm four days prior to the robbery; and 3) the trial court erred when it sentenced him to the maximum penalty for obstruction of justice and ordered the sentence to run consecutive to his life sentence.

**LAW AND ANALYSIS**

Sufficiency of Evidence

Defendant asserts that there is insufficient evidence to support his obstruction of justice conviction. He posits that the State did not offer any direct evidence that he intentionally tampered with or removed evidence to thwart the criminal investigation. He provides that the only circumstantial evidence was

surveillance video showing him walk toward a dumpster at a gas station in Biloxi and Rodgers' testimony. Defendant argues that Rodgers did not testify that he saw Defendant dispose of the gun but rather claimed that Defendant told him that he did so. He concludes that his conviction for obstruction of justice should be vacated because the evidence fails to rebut every reasonable hypothesis of innocence.

The State avers that there was ample support for the obstruction of justice conviction. It provides that the evidence established that Defendant possessed and discharged a firearm during the commission of a first degree murder, and that he fled the scene with the weapon. The State explains that Rodgers' testimony was corroborated by other evidence. It also argues that Defendant's intentional bleaching and disposal of the clothing worn during the murder and his disposal of ammunition provided additional evidence that in discarding the firearm, he specifically intended to distort the results of the criminal investigation. The State concludes that Defendant knew that his actions would result in a criminal investigation that would focus on the murder weapon and the identity of the shooter, and that he fled the scene with the gun and disposed of it with the intent of avoiding detection as the shooter.

The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. *State v. Nguyen*, 22-286 (La. App. 5 Cir. 2/27/23), 359 So.3d 108, 118. Defendant filed a motion for post verdict judgment of acquittal and for new trial on August 9, 2023. In that motion, he contended that the verdict was contrary to the law and the evidence. He also alleged that Dr. Troxclair could not opine to a reasonable degree that the victim's death was or was not caused by any act or failure to act on the part of the hospital and that the State failed to prove guilt beyond a reasonable doubt. Defendant argued that the judge erroneously ruled on

the defense's use of a hypothetical situation pertaining to reasonable doubt. Finally, Defendant contended that a phone call admitted at trial was not voluntarily made, and it should not have been admitted into evidence.

The judge explained that this was one of the strongest cases she has presided over as a judge, and the jury was correct in its verdict. The judge stated that the life-saving measures were not the cause of death but rather the cause was the "gunshot that was cold-bloodedly delivered by the [D]efendant." The judge also addressed the sustained objection regarding the hypothetical and said that it was not a fair comparison or description of the required burden of proof. She further provided that Defendant was warned that the jail calls were being monitored. The judge denied the motion.

In reviewing the sufficiency of the evidence, an appellate court must determine if the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Johnson*, 23-273 (La. App. 5 Cir. 2/28/24), 382 So.3d 1129, 1133.

The directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Aguilar*, 23-34 (La. App. 5 Cir. 11/15/23), 376 So.3d 1105, 1108. The resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *State v. Woods*, 23-41 (La. App. 5 Cir. 11/15/23), 376 So.3d 1144, 1157, *writ denied*, 23-1615 (La. 5/29/24), 385 So.3d 700. Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is

sufficient to support a conviction. *State v. Sly*, 23-60 (La. App. 5 Cir. 11/2/23), 376 So.3d 1047, 1072, *writ denied*, 23-1588 (La. 4/23/24), 383 So.3d 608.

This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. *State v. Gassenberger*, 23-148 (La. App. 5 Cir. 12/20/23), 378 So.3d 820, 829. As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at trial established guilt beyond a reasonable doubt but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *Id.*

Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *State v. Romero*, 23-376 (La. App. 5 Cir. 2/28/24), 383 So.3d 1045, 1053. When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *Woods*, 376 So.3d at 1155. This is not a separate test from the *Jackson* standard but rather provides a helpful basis for determining the existence of reasonable doubt. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *Id*. Evidence of flight, concealment, and attempt to avoid apprehension is relevant and admissible to prove consciousness of guilt from which the trier-of-fact may infer guilt. *State v. Davis*, 18-485 (La. App. 5 Cir. 4/10/19), 269 So.3d 1123, 1132, *writ denied*, 19-716 (La. 11/12/19), 282 So.3d 229.

Encompassed within proving the elements of an offense is the necessity of

proving the identity of the defendant as the perpetrator. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. *State v. Key*, 23-167 (La. App. 5 Cir. 12/27/23), 379 So.3d 96, 113.

La. R.S. 14:130.1(A)(1) provides that the crime of obstruction of justice, when committed with the knowledge that such act may affect a criminal proceeding, includes "[t]ampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding." This provision further states that "[t]ampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance" at the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any law enforcement investigation. Here, the indictment specified that Defendant obstructed justice by tampering with evidence with the specific intent to distort the results of a first degree or second degree murder investigation by "removing from the scene of the shooting incident and subsequently disposing of the murder weapon, knowing that such action or actions has affected, reasonably may affect, or will affect an actual or potential present, past or future criminal proceeding."

The knowledge requirement of obstruction of justice is met if the perpetrator merely knows that an act "reasonably may" affect a criminal proceeding. The statute does not require the criminal proceeding actually be affected; the perpetrator just must know and understand that the act reasonably may affect the proceeding. *State v. Nicholas*, 10-866 (La. App. 5 Cir. 5/24/11), 67 So.3d 610, 615. To support a conviction, the State must prove more than the mere removal of evidence from a crime scene; the State must also prove that such removal was done with "the specific intent of distorting the results of any criminal investigation or

proceeding which may reasonably prove relevant to a criminal investigation or proceeding." La. R.S. 14:130.1(A)(1).

The Louisiana Supreme Court in *State v. Jones*, 07-1052 (La. 6/3/08), 983 So.2d 95, 101-02, outlined four elements of obstruction of justice that must be met. First, the obstruction must be committed with the knowledge that such act has, reasonably may, or will affect an actual or potential, past, or future criminal proceeding. *Id*. at 101. Second, the defendant must tamper with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. *Id*. at 102. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act and may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); *State v. Holliday*, 17-1921 (La. 1/29/20), 340 So.3d 648, 666, *cert. denied*, --- U.S.---, 141 S.Ct. 1271, 209 L.Ed.2d 10 (2021). Third, the statute provides that the tampering be either by the intentional alteration, movement, removal, or addition of any object or substance. Nothing beyond movement of the evidence is required by the statute if accompanied by the requisite intent and knowledge. *Jones*, 983 So.2d at 102; *State v. Tatum*, 09-1004 (La. App. 5 Cir. 5/25/10), 40 So.3d 1082, 1090. Fourth, the tampering must be done at the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by law enforcement officers. *Jones*, *supra*.

We find that there was sufficient evidence to convict Defendant of obstruction of justice based on his removal of and disposal of the gun. In *State v. Bethley*, 22-849 (La. App. 4 Cir. 6/21/23), 368 So.3d 1148, 1155, *writ denied*, 23-965 (La. 1/17/24), 377 So.3d 242, the defendant argued that there was insufficient evidence to convict him of obstruction of justice because the State could not

definitively prove that he removed the firearm from the crime scene. The Fourth Circuit explained that the argument was unpersuasive as the defendant testified that he left the scene of the crime with the firearm used in the commission of the crime. Additionally, the evidence established that a firearm was not located at the scene of the crime and was never recovered by law enforcement. The court explained that during his testimony, when questioned about the whereabouts of the firearm, the defendant evasively responded to the question and never provided a direct answer. The court concluded that it was reasonable to infer that the defendant left the scene with the firearm that he knew would be the subject of a criminal investigation. *Id*. at 1156.

Similarly, in *State v. Harvey*, 21-730 (La. App. 4 Cir. 5/25/22), 345 So.3d 1043, *writ denied*, 22-953 (La. 9/20/22), 346 So.3d 803, the defendant averred that there was insufficient evidence to support his conviction for obstruction of justice. The Fourth Circuit explained that in the defendant's statement, he admitted to fleeing the scene with the gun he used to shoot the victims, then later disposing of the gun, stating that he gave it to someone. The court stated that the defendant's action in this regard was significant as it showed that the defendant tampered with evidence with the specific intent of distorting a murder investigation. The court explained that viewing the evidence, specifically the undisputed fact that the defendant fled the scene with his weapon and later disposed of it, in the light most favorable to the prosecution, it was clear that a rational trier of fact could have found, beyond a reasonable doubt, that the defendant obstructed justice by tampering with evidence with the specific intent of distorting the results of the pertinent criminal investigation. *Id*. at 1050.

Further, in *State v. Manuel*, 21-273 (La. App. 4 Cir. 4/6/22), 337 So.3d 967, 974, at trial, the defendant admitted that he was involved in the shooting and that, rather than remaining on scene, he fled the area, returning to Lafayette, instead of

staying on scene to assert his claim of firing shots in self-defense. Thereafter, the defendant learned that authorities were looking for him, but he did not turn himself in. At trial, he asserted that he put the gun back where he always kept it; however, he admitted to lying to investigators about having a gun, its whereabouts, and his involvement in the shooting. Moreover, the jury heard the jail calls between the defendant and his girlfriend in which he stated he would "beat this s**t" and agreed with her that he "played it smart." The Fourth Circuit found that the defendant's actions of fleeing the scene of the shooting, concealing the weapon in his mother's house underneath a bed, and lying to investigators about his involvement in the shooting as well as the gun he used, all indicated his specific intent to distort the results of the criminal investigation. *Id.*

In *State v. Jones*, 18-973 (La. App. 4 Cir. 2/27/19), 314 So.3d 1, 14-15, *cert. granted, judgment vacated*, --- U.S. ---, 141 S.Ct. 1041, 208 L.Ed.2d 513 (2021),[25] the court found sufficient evidence existed to support the defendant's conviction for obstruction of justice. The court explained that the defendant admitted to discarding the gun, which established that he secluded a piece of evidence with the intent to distort the results of an investigation. The court stated that because the defendant disposed of the gun and the police were unable to recover it, he was able to assert at trial that the weapon was a water gun. Also, the defendant insisted to an officer that it would be "dumb" to carry a firearm based on a prior conviction, which further showed that the defendant knew possession of a gun could affect potential criminal proceedings against him. The court found that a reasonable juror could conclude that by disposing of the gun in the canal, the defendant was attempting to avoid future criminal proceedings. *Id.*

In *State v. Powell*, 15-218 (La. App. 4 Cir. 10/28/15), 179 So.3d 721, *writ*

---

[25] The judgment was vacated, and the matter was remanded in light of *Ramos v. Louisiana*, 590 U.S. 83, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020).

*denied*, 15-2166 (La. 11/7/16), 208 So.3d 897, the defendant argued that there was insufficient evidence, and the Fourth Circuit affirmed the defendant's obstruction of justice conviction. There, the police responded to a call about a shooting and spoke to the defendant. The defendant admitted that he was involved in a confrontation, but he denied firing a gun, instead alleging that he had fired a paintball gun during the dispute. The defendant then showed the officers a paintball gun. None of the officers found spent bullets or observed any bullet holes/strike marks on the scene. However, three spent shell casings were recovered within feet of the defendant's property. *Id*. at 724. The court explained that the defendant's conviction was based on his removal of the weapon from the scene of the shooting—that is, the hiding of the weapon in a jacket in the back of his closet. *Id*. at 728. Addressing the knowledge requirement, the court stated that the defendant was previously convicted of a felony and that a prior conviction alone, was sufficient to find that the defendant had the knowledge required by the statute. The court provided that, by offering his paintball gun as an explanation for the allegations, the defendant explicitly demonstrated his intent to distort the investigation. The Fourth Circuit stated that when accompanied by the requisite knowledge and intent, all that is required to obstruct justice is movement of evidence. The court found that the information provided in a jail house call, insinuating that his sister retrieve the gun provided a reasonable basis for the conclusion that the defendant moved the weapon from his possession and concealed it in his bedroom closet. *Id*.

In the instant matter, we find that the State sufficiently established that Defendant obstructed justice. The surveillance video from the Shell gas station in Kenner showed Defendant leave with the murder weapon in his hand. His brother, Rodgers, testified that Defendant told him that he threw his gun in a trash can at the Shell gas station in Biloxi. Surveillance video from that gas station reflected

that Defendant walked to the dumpster. Detective Savoie contacted Waste Management in Biloxi and was told that it was highly unlikely that the discarded firearm could be located. The firearm was never recovered. We find that a reasonable juror could conclude that, by disposing of the gun in a dumpster in another state, Defendant was attempting to distort the results of any criminal investigation or proceeding and avoid future criminal proceedings.

Additionally, we find that several other actions by Defendant support an inference of his specific intent to obstruct justice. Shortly after the crime, Defendant separated the bullets from the gun and disposed of them. Rodgers testified that Defendant took his clothing, poured bleach on it, and discarded it in someone else's trash can in another parish. Defendant then fled the state, first going to Mississippi and then to Tennessee. Rodgers explained that they went to Tennessee by way of Mississippi to avoid the police. For those reasons, based on the evidence presented, we find that the evidence was sufficient to support a finding that Defendant removed and disposed of the gun, thereby supporting Defendant's conviction for obstruction of justice.

Admission of Stolen Firearm

On appeal, Defendant argues the trial court erroneously permitted the introduction of evidence that Defendant stole a firearm from his sister, April, in Memphis. He says that Rodgers did not testify that Defendant stole the gun from April. He contends that the allegation was too attenuated to be admissible as *res gestae*. Defendant argues that the evidence was not relevant, that its exclusion would not have deprived the State of presenting a complete story, and that there was no immediate connection between the theft and the robbery. He avers that there was no evidence that the gun stolen in Memphis was the gun used in the robbery or that he stole the gun. Further, Defendant asserts that the evidence was inadmissible under La. C.E. art. 404(B) because it was not necessary to prove any

material fact genuinely at issue and that there was insufficient evidence that he stole the gun.

The State disagrees that the trial court abused its discretion in admitting the evidence. It argues that, because Defendant raises for the first time on appeal the argument that there was insufficient evidence that he stole the firearm, the argument is not properly before this Court. The State avers that the purpose of the evidence was to complete the story of the crime by proving its immediate context in time and place, which was integral to show the progression of Defendant's criminal activity and accompanying intent. It contends that it was entitled to present its case with narrative momentum and cohesiveness. The State asserts that the evidence was also admissible under La. C.E. art. 404(B) as it was independently relevant to the issues of identity, preparation, and plan. It also provides that the probative value of the evidence was not substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, or waste of time. The State concludes that even if the trial court erred, it was harmless.

On June 29, 2023, the State filed a motion for discovery, demand for notice of alibi and/or mental condition defenses, and a notice of intent to introduce evidence of other offenses. In that motion, the State provided that it intended to introduce evidence admissible under La. C.E. arts. 404 and 412.2 as described in the discovery. On July 19, 2023, the State filed a notice of intent to introduce evidence as *res gestae* or in the alternative under La. C.E. Article 404(B).[26] In the notice, the State explained that it intended to introduce as *res gestae* or Article 404(B) evidence that Defendant possessed a firearm stolen from April in Memphis, which he used three days later to commit the charged homicide. It provided that it

---

[26] The State filed a Motion to Seal its notice of intent because it was "sensitive in nature and its release could endanger the witness[.]"

expected Rodgers to testify that Defendant showed him a 9 mm Taurus firearm that he got from April. The State argued that the evidence was related and intertwined with the charged offense to such an extent that it could not accurately present its case without it. The State further argued that even if not admissible as *res gestae* evidence, it was admissible under the general provisions of La. C.E. art. 404(B).

On July 23, 2023, Defendant filed an opposition to the State's intent to introduce evidence as *res gestae* or in the alternative under La. C.E. Article 404(B). Defendant argued that the charged offense was remote and independent from the alleged taking of April's gun. He contended that the evidence was not indispensable to the State's case and did not serve a legitimate purpose. Defendant asserted that the State could not prove that the gun was not taken from April's home for some other reason. He opined that the State would not be hindered in presenting its case without the evidence. Defendant also provided that possession of a stolen firearm is a separate and distinct unrelated offense. He argued that the evidence is highly prejudicial and not relevant. Defendant concluded that the evidence should not be admitted.

On July 24, 2023, a hearing on the State's notice of intent was held. Defense counsel argued that the evidence at issue was not *res gestae* and not necessary for narrative completeness. He suggested that the firearm was not more or less lethal because it was allegedly stolen and that the victim was not more or less dead because the gun was allegedly stolen. Counsel argued that Article 404(B) is an assault on the presumption of innocence. Counsel next argued that the evidence was remote in that it was allegedly stolen in Memphis. He contended that the evidence lacked probative value. Defense counsel requested that if the evidence was admitted, that there be a cautionary charge at the time the evidence was introduced and in the final jury charge.

The prosecutor replied that the evidence was necessary for narrative completeness and went to identity. She provided that the charged offense occurred days after the firearm was stolen. The prosecutor explained that the State intended to introduce evidence that the gun was reported stolen and that Defendant admitted that the gun was taken from his cousin who reported it stolen. She explained that the State would allege that the stolen firearm was the weapon used in the homicide.

Defense counsel responded that the firearm was never recovered and reiterated that the firearm was allegedly stolen in Memphis several days before the murder. He argued that this was an attempt to paint Defendant as a bad person. The judge then granted the State's notice of intent to introduce evidence as *res gestae* or in the alternative under La. C.E. Article 404(B).

A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *State v. Thomas*, 19-582 (La. App. 5 Cir. 7/29/20), 300 So.3d 517, 526, *writ denied*, 20-1503 (La. 3/2/21), 311 So.3d 1053. The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is that such evidence is not admissible to prove that the accused committed the charged crime because the defendant has committed other such crimes in the past. *Id*. *See also* La. C.E. art. 404(B)(1). Evidence of other crimes, wrongs, or acts committed by the defendant is generally inadmissible because of the "substantial risk of grave prejudice to the defendant." *State v. Ard*, 20-221 (La. App. 5 Cir. 4/28/21), 347 So.3d 1046, 1055 (citing *State v. Prieur*, 277 So.2d 126 (La. 1973)).

However, while the State may not admit evidence of other crimes to prove the defendant is a person of bad character, evidence of prior crimes may be admitted if the State establishes an independent relevance aside from proving the defendant's criminal character. *State v. Frickey*, 22-261 (La. App. 5 Cir. 3/1/23), 360 So.3d 19, 49, *writ denied*, 23-468 (La. 11/8/23), 373 So.3d 59. Evidence of other crimes, wrongs, or acts is allowed to prove motive, opportunity, intent,

preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct, formerly referred to as *res gestae*, that constitutes an integral part of the act or transaction that is the subject of the present proceeding. *Id. See also* La. C.E. art. 404(B)(1).

*Res gestae* events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the State could not accurately present its case without reference to them. *State v. Rodney*, 19-195 (La. App. 5 Cir. 10/23/19), 282 So.3d 395, 403. The *res gestae* doctrine is designed to allow the story of the crime to be told in its entirety by proving its immediate context of happenings in time and place. *Id*. Close connexity in time and location is required between the charged and uncharged conduct to ensure that "the purpose served by admission of the other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." *State v. Smith*, 23-263 (La. App. 5 Cir. 12/27/23), 379 So.3d 206, 212. The fact the other crimes occurred in different locations with different victims is not dispositive of the issue. As long as the other crimes "constitute an integral part of the act or transaction that is the subject of the present proceeding," they are admissible as *res gestae* evidence. *State v. Taylor*, 01-1638 (La. 1/14/03), 838 So.2d 729, 743, *cert. denied*, 540 U.S. 1103, 124 S. Ct. 1036, 157 L.Ed.2d 886 (2004).

The test of whether *res gestae* evidence is admissible is not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive its case of narrative momentum and cohesiveness, with power not only to support conclusions, but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. *Smith*, *supra*. Close proximity in time and location is required between the charged offense and the other crimes evidence to

insure that the purpose served by admission of other crimes evidence is not to depict defendant as a bad man, or that the defendant acted in conformity with the other crime, but rather to complete the story of the crime for which he is on trial by proving its immediate context of happenings near in time and place. *State v. Brown*, 17-348 (La. App. 5 Cir. 12/20/17), 235 So.3d 1314, 1326, *writ denied*, 18-158 (La. 11/5/18), 256 So.3d 276, *cert. denied*, --- U.S. ---, 139 S.Ct. 2033, 204 L.Ed.2d 233 (2019).

The State must provide the defendant with notice and move for a hearing before trial if it intends to offer other crimes evidence. *Frickey*, 360 So.3d at 49. However, the State is not required to provide the defendant with notice before introducing *res gestae* evidence. *Id*. Even when the other crimes evidence is offered for a purpose allowed under Article 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. *Id*. at 50.

Additionally, the probative value of the extraneous evidence must outweigh its prejudicial effect. La. C.E. art. 403; *State v. Shorter*, 23-128 (La. App. 5 Cir. 11/29/23), 377 So.3d 421, 436, *writ denied*, 23-1669 (La. 5/29/24), 385 So.3d 704. Any inculpatory evidence, however, is "prejudicial" to a defendant, especially when it is "probative" to a high degree. *Gassenberger*, 378 So.3d at 839. As used in the balancing test, prejudice limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. *State v. Johnson*, 22-383 (La. App. 5 Cir. 8/9/23), 370 So.3d 150, 160. The term "unfair prejudice," as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged. *Ard*, 347 So.3d at 1057. The burden is on the defendant to show that he was prejudiced by the admission of other crimes evidence. *Id.*

In *State v. Pourciau*, 16-521 (La. App. 1 Cir. 12/22/16), 2016 WL 7409382, *writ denied*, 17-166 (La. 11/6/17), 229 So.3d 471, the defendant argued that other crimes evidence was improperly allowed at trial. Among other things, he took issue with evidence that he possessed a stolen gun, which he used to kill the victim. When arrested, the defendant had a collector's item firearm. The defendant's stepfather testified that he was the owner of that firearm and that the defendant stayed with him from "time to time" from February to April of 2013. The charged murder occurred in April of 2013. When the defendant's stepfather realized his gun was missing, he filed a report with the police. He informed the police officer that there was no forced entry at his residence. The First Circuit found that the evidence was relevant to show the defendant's state of mind and had independent relevance to the issues of preparation, plan, and absence of mistake or accident. Further, the court stated that it helped explain and complete the story by proving the defendant's state of mind and the immediate context of events near in time and place to the offense.

Here, we find the trial court did not abuse its discretion in admitting the other crimes evidence that the firearm was stolen from Defendant's sister in Memphis. As stated, the trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. We find that the evidence is *res gestae* evidence as it completes the story of the crime. The introduction of the evidence was relevant as to Defendant's opportunity, plan, and absence of mistake or accident and it provided narrative momentum and cohesiveness.

Even if the trial court erred in admitting the evidence at trial, the erroneous admission of other crimes evidence is subject to harmless error analysis. *Frickey*, 360 So.3d at 50. In determining harmless error, it is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but

whether the guilty verdict actually rendered in the trial was surely unattributable to the error." *Id*. An error is harmless beyond a reasonable doubt if it is unimportant in relation to the whole. *State v. Brown*, 16-998 (La. 1/28/22), 347 So.3d 745, 791, *reh'g denied*, 16-998 (La. 3/25/22), 338 So.3d 1138, and *cert. denied*, --- U.S. ---, 143 S.Ct. 886, 215 L.Ed.2d 404 (2023).

In this matter, we find that, even if there was an error in admitting the evidence, it was harmless. Evidence of Defendant's guilt for the crimes of first degree murder and obstruction of justice was not "enhanced" by admitting evidence that he stole the firearm. *See State v. Kimble*, 22-373 (La. App. 5 Cir. 5/8/24), 2024 WL 2037528. Rodgers testified to robbing the gas station with his Defendant, and Defendant shot the victim and disposed of the gun. Additionally, the robbery/shooting was captured from various angles by security cameras. The footage shows a latex glove fall out of the shooter's pocket and onto the counter when he removed the firearm. Defendant's DNA was found on that glove. Surveillance footage from the gas station in Biloxi shows Defendant go to the dumpster alone. During a recorded phone call, Defendant indicated that he committed the offenses. He further said that he was not high or drunk and that no one put the gun in his hand. Defendant's mother identified Defendant in still photographs of surveillance footage. The jury was given a limiting instruction as to the other crimes evidence after the State's opening statement, after Rodgers testified about the evidence, and during the jury instructions. Based on the foregoing, we find that the verdicts were surely unattributable to admission of the other crimes evidence.

Errors Patent Review

The record was reviewed for errors patent according to La. C.Cr.P. art.

920;[27] *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990).

La. C.Cr.P. art. 873 states in part, "If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled." When a defendant challenges the penalty imposed and the imposed sentence is not mandatory, the failure to observe the twenty-four-hour delay mandated in La. C.Cr.P. art. 873 cannot be considered harmless error. *State v. Kelson*, 23-274 (La. App. 5 Cir. 12/27/23), 379 So.3d 779, 786. Generally, when a defendant challenges a non-mandatory sentence and the delay is not waived, the defendant's sentence must be vacated and the matter remanded for resentencing. *Id*.

The Louisiana Supreme Court in *State v. Kisack*, 16-797 (La. 10/18/17), 236 So.3d 1201, 1205-06, *cert. denied*, 583 U.S. 1160, 138 S.Ct. 1175, 200 L.Ed.2d 322 (2018), stated that a defendant's pronouncement of his readiness for sentencing may operate as an express waiver of the twenty-four-hour sentencing delay, but a defendant's mere participation in the sentencing hearing is insufficient to constitute an express waiver as required by La. C.Cr.P. art. 873.

In the present case, Defendant filed a motion for post-verdict judgment of acquittal and for a new trial on August 9, 2023. The trial court denied the motion on August 10, 2023, and imposed Defendant's sentences thereafter on the same day after a victim impact statement was read. At the hearing, after the trial court denied the motion and heard the victim impact statement, the trial court asked the defense if there was anything further, and the defense answered negatively. We find that this was not an express waiver of the requisite sentencing delay. Defendant's life sentence for the first degree murder conviction is mandatory, and

---

[27] La. C.Cr.P. art. 920(2) states that an error patent is "[a]n error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."

he does not challenge it. However, Defendant challenges his sentence as to the count of obstruction of justice, which does not carry a mandatory sentence.[28] Therefore, we vacate the sentence imposed for the obstruction of justice conviction (count two) and remand the matter to the trial court for resentencing. (*See State v. Francis*, 19-227 (La. 4/29/19), 268 So.3d 289, finding that the defendant did not waive the delay, and the error in failing to observe the delay was not harmless because the defendant challenged his manslaughter sentence, thereby vacating the sentence and remanding the matter.). In light of this error patent and corrective action, we pretermit discussion of Defendant's consecutive sentence assignment of error.

Additionally, the UCO incorrectly reflects the date of the offense on count two as November 30, 2020. The indictment reflects that the offense occurred between November 30, 2020 and December 2, 2020. The evidence presented at trial suggested that the firearm at issue was removed from the scene of the offense on November 30, 2020, and repeatedly was manipulated until it was ultimately disposed of on December 1, 2020. This Court has previously remanded a case for correction of the UCO regarding the date of the offense in its errors patent review. *See State v. Doucet*, 17-200 (La. App. 5 Cir. 12/27/17), 237 So.3d 598, *writs denied*, 18-77 (La. 10/8/18), 253 So.3d 789, and 18-196 (La. 11/5/18), 255 So.3d 1052, *cert. denied*, ---U.S. ---, 139 S.Ct. 2676, 204 L.Ed.2d 1079 (2019). *See also State v. Harrell*, 18-63 (La. App. 5 Cir. 10/17/18), 258 So.3d 1007; *State v. Lyons*, 13-564 (La. App. 5 Cir. 1/31/14), 134 So.3d 36, *writ denied*, 14-481 (La. 11/7/14), 152 So.3d 170. Accordingly, we remand the matter for correction of the UCO to accurately reflect the date range of the offense for count two. We also direct the Clerk of Court for the 24th Judicial District Court to transmit the original of the

---

[28] Additionally, Defendant challenges the consecutive nature of his sentences.

corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department. *See Harrell*, *supra*.

## DECREE

For the foregoing reasons, we affirm Defendant's convictions for first degree murder and obstruction of justice. We affirm Defendant's first degree murder sentence. We vacate Defendant's obstruction of justice sentence and remand the matter to the trial court for resentencing. We also remand this matter to the trial court for correction of the uniform commitment order.

**CONVICTIONS AFFIRMED;**
**COUNT ONE SENTENCE AFFIRMED;**
**COUNT TWO SENTENCE VACATED;**
**REMANDED FOR RESENTENCING;**
**REMANDED FOR CORRECTION OF**
**THE UNIFORM COMMITMENT ORDER**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **OCTOBER 30, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**23-KA-519**

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE ELLEN SHIRER KOVACH (DISTRICT JUDGE)
ANDREA F. LONG (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          JANE C. HOGAN (APPELLANT)

**MAILED**
BRITTANY BECKNER (APPELLEE)
CAROLYN CHKAUTOVICH (APPELLEE)
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053